## ANNA PELL *vs.* ANN JANE MERCER *et als.*

A testamentary gift for purposes both public and benevolent, when the will shows it to have
been inspired by philanthropy and aimed at permanent good, is a charitable gift.

A bequest of personalty in trust for such works of religion or benevolence as the executors
of the will may select is a good gift to charitable uses, when it appears from the will that
benevolence is used in the legal sense of charity.

The law of charitable uses as administered by English chancery in its regular jurisdiction is
a part of the law of this State.

The Supreme Court of Rhode Island having full chancery powers by statute has so much of
the *cy pres* power as is exercised by English chancery, without recourse to the preroga-
tive powers delegated to it in particular cases by the sign manual of the crown.

Sketch of legislative enactment and judicial decision in Rhode Island relative to charitable
trusts and the doctrine of *cy pres*.

Testamentary disposition as follows:

" I desire my executors to select from my stock investments such of them as it may be most judicious to sell, and to realize from such sales enough money to pay the gifts made in Section III., and afterwards and gradually and to the best advantage to sell all my shares of stock, and to invest the proceeds in the bonds of the State of California, and to deposit said bonds, together with all my other bonds, with the Pennsylvania Company for Insurance on Lives and granting Annuities, in the city of Philadelphia, for the purposes hereinafter named. . . .

" All my property over and above the gifts made in the preceding sections, consisting of the bonds I now hold or may acquire, and the bonds of the State of California to be purchased by the sale of my stocks as aforesaid, and all of which is to be deposited as aforesaid with the said Pennsylvania Company for Insurance . . . I divide into thirty (30) shares, to be held and managed by said company, in trust, to pay the interest on these shares to the following persons for the term of their natural lives." . . .

Subsequent clauses disposed of the principal of the property of which the interest was thus bequeathed.

*Held,* the will being inartificial and containing many intimations that the testator did not intend to die partially testate and partially intestate, that the residue was disposed of by the will and that there was no intestacy.

It appearing that owing to the paucity of California bonds the investment and reinvestment in them was impossible :

*Held,* that the paramount intent must prevail, the special direction being a means to obtain a safe investment.

*Held,* further, that no intestacy resulted from the impossibility of making the special investments directed.

*Held,* further, that the necessary changes of investment should be made under the direction of the court after reference to a master.

*Held,* further, that the court would not give present directions as to future investments or reinvestments.

When a *residuum* is given to trustees to pay the income to legatees for life with remainder over, the life legatees are entitled to the actual income from the death of the testator.

*Held,* that this rule was not here varied by the direction to convert.

*Held,* further, that the life beneficiaries of the thirty shares were entitled to the income, less taxes, from the testator's death.

*Bailey, Petitioner,* 13 R. I. 543, affirmed.

*Held,* further, that the English practice as to the conversion of wasting securities should not, for the present, at least, be applied to this case.

*Query,* as to the treatment of new investments after bonds acquired or to be acquired have run out.

When discretionary powers are given to executors to determine the objects of charitable testamentary gift :

*Held,* that the powers could not be exercised by such of the nominated executors as did not qualify.

*Held,* further, that the powers could be exercised by such as qualified.   See, also, Pub. Stat. R. I. cap. 184, § 22.

*Held,* further, that the powers should be exercised under the direction of the court after reference to a master, especially as the fund, after the powers had been exercised, was to pass out of the jurisdiction of the court.

The misnomer of a legatee or devisee is immaterial if the beneficiary intended can be identified by the testamentary description.

In a legacy to several enumerated corporate officers and three specified individuals, " should they or either of them then be alive : "

*Held,* that the gift was to the officers holding office when the legacy became payable, and that the conditional words applied only to the individuals.

BILL IN EQUITY to obtain a judicial construction of the following will, which was proven before the Probate Court in Newport, December 4, 1882.

" I, Alexander G. Mercer, of Newport, Rhode Island, do make, ordain, and declare this instrument, which is written with my own hand and every page of it subscribed with my name, to be my last will and testament.

1st. I appoint my friends, Mrs. Duncan C. Pell, of Newport, Edward King, of Newport, and Frederick W. Rhinelander, of New York, executrix and executors of this my will; and in case of the failure of any one of them I appoint my friend, John J. Townsend, of New York, as a substitute; and, as I regard the execution of this will a work of charity as well as of friendship, I hope that said executors may accept a thousand dollars each in lieu of all other remuneration.

" SECTION II. I desire my executors to select from my stock investments such of them as it may be most judicious to sell, and to realize from such sales enough money to pay the gifts made in Section III., and afterwards and gradually and to the best advantage to sell all my shares of stock, and to invest the proceeds in the bonds of the State of California, and to deposit said bonds, together with all my other bonds, with the " Pennsylvania Company for Insurance on Lives and Granting Annuities," in the city of Philadelphia, for the purposes hereinafter named.

" SECTION III. I give in cash and bequeath absolutely the following sums to the following persons, namely : to my nieces, Jane, Maria, and Emily, two thousand dollars each, free from the control of their husbands; to Alexander Mercer Biddle, son of Charles I. Biddle, of Philadelphia, five thousand dollars; to Philip Mercer Rhinelander, son of Frederick W. Rhinelander, one thousand dollars; to James, son of Emily De Blois, $1,000; to Trinity Church, Newport, $1,000, as a fund for the poor of said church; to Zion Church, Newport, $500; to Emmanuel Church, Newport, $500; to the society or fund meant to assist aged or infirm and indigent clergymen of the Protestant Episcopal Church in Rhode Island, $1,000; to Miss Elizabeth Casttoff, daughter of Captain Henry Casttoff, of Newport, $1,000 ; to Rev. Dr. H. A. Boardman, $1,000; to Professor Child, of Cambridge, Mass., $1,000 ; to the

Redwood Library, Newport, for the establishment of a case or compartment of books, $1,000; to Miss Juliet Goodwin, of Newport, $500; to Miss Annie Coggeshall, of Mill Street, Newport, $500; to George E. Bullard (clerk with D. S. Curtis, of Boston), $500; to William Rushton, Jr., Cashier, Philadelphia, $500; to Frederick W. Rhinelander, aforesaid, $2,000; to the Society for the Aged and Infirm (women or men) in Newport, $1,000; and to Alexander Mercer King, my godchild, for a remembrance only (as he will not need money), $1,000.

"SECTION IV. The building called All Saints Church, in Newport, was put in trust by me some years ago, but lest that act should prove invalid I now give and bequeath the same, together with the organ, furniture, &c., to Benjamin Finch, Mrs. Duncan C. Pell, of Newport, and Frederick W. Rhinelander, of New York, and to their successors in trust forever (the trustees for the time being always appointing those who shall succeed them), for the purposes and uses of religious worship according to the forms of the Protestant Episcopal Church in the United States of America, provided and on condition that the right of the appointment of the rector of said church belong to me and after me to my said trustees and their successors forever.

"SECTION V. I give and bequeath my long worn watch and the chain attached, the silver cup my mother gave me, together with the two rings I wear (articles precious to me), to Miss Janetta Alexander, only daughter of Dr. A. Alexander, with my ever tender remembrances.

"SECTION VI. I give and bequeath all the rest of my personal effects, such as silver, jewelry, furniture, &c., together with my books, to the said Mrs. Duncan C. Pell; desiring her, however, to present from me to each of my friends some book or other article at her discretion. Among the friends thus to whom she is to give some memorial of me I will name my dear cousin William M. Baird, of Phila.; Charles I. Biddle, Craig Biddle, also of Phila.; Frederick W. Rhinelander, John J. Townsend, George P. Putnam, of New York; Mrs. and Miss Hunter, Edward King, Sidney Brooks, Mrs. Clarence Pell and her children, Dr. Linzie Cunningham, Dr. T. Thayer, and Miss Callender, of Newport; also B. Finch and J. T. Langley of Newport; Colonel and Mrs.

Pell, Cortlandt Parker, Prof. Child, Rev. J. E. Wood. Beyond these I desire to give some memorial to any other friend whom I have not thought of at this moment. After these gifts are made I desire her to select such of my books as she may wish for herself, and then to divide the rest between my namesakes Alexander M. Biddle and A. M. King.

" SECTION VII. I give and bequeath to the said Mrs. Duncan C. Pell the sole right and property in all my sermons and papers of every description, to her and to her only.

" SECTION VIII. I do not leave any share of my property to my brother, John C. Mercer, because he will need none of it, but I request him to accept from me my two marble lions, with every kind and earnest good wish.

" SECTION IX. All my property over and above the gifts made in the preceding sections, consisting of the bonds I now hold or may acquire, and the bonds of the State of California to be purchased by the sale of my stocks as aforesaid, and all of which is to be deposited as aforesaid with the said Pennsylvania Company for Insurance, &c., I divide into thirty (30) shares, to be held and managed by said company, *in trust*, to pay the interest on these shares to the following persons for the term of their natural lives, to wit : to pay to the said Mrs. Duncan C. Pell the interest on twelve (12) shares, hoping that she will use as much of the same as she needs for her own pleasure and comfort, and dispose of all the rest in deeds of judicious mercy and charity ; to pay the interest on five (5) shares, to the said Miss Janetta Alexander ; on one (1) share to the said Charles J. Biddle ; on one (1) share to Miss K. P. Wormeley, of Newport ; on two (2) shares to my niece Jane, Mrs. Brice ; on two (2) shares to my niece Maria, Mrs. Boyd ; on two (2) shares to my youngest niece Emily, to be held and used by my said nieces free from all control by their husbands ; on one share and a half (1½) to Mrs. Mary Hunter and her daughter, Miss Rebecca Hunter, and to the survivor of them ; on a half of a share to Mrs. Sophia Little, formerly Miss Robbins, of Newport ; on one (1) share to Mrs. Randolph Latimer, formerly Miss Elizabeth Wormeley ; on two (2) shares to my four cousins, Catherine, George, Margaret, and Isabella Hamilton (now Biddle), children of my Aunt Hamilton, but the interest on these

two (2) last named shares is to be paid to my said cousins only until the decease of my brother John C. Mercer.

"SECTION X. I will that on the decease of each person named in the IX. (9th) Section, or in case any of them refuse to accept the benefit offered, or in case of the death of any of them before it can be received, or in respect to the two shares last named in IX. Section (in case of the decease of said J. C. Mercer), the interest in the shares or share or portion of a share appropriated to said persons be regularly reinvested, and all in the bonds of the State of California, and accumulated in the hands of said Pennsylvania Company until the decease of the last of all the persons entitled during their lifetime to draw the said interest on the said shares, and then I will that the whole of my property thus deposited and falling in and accumulated in the hands of said 'Pennsylvania Company,' be disposed of as follows: (1st.) One third of it ($\frac{1}{3}$) to be paid to the managers or directors of the Pennsylvania Hospital on Pine Street, in Philadelphia, and to the managers or directors of the Massachusetts General Hospital, in Boston, to be used by them for the establishment of a hospital of such a character and in such a place as may seem to them most desirable. (2d.) One third ($\frac{1}{3}$) of said property to be paid to the President of Harvard University in Cambridge, Mass.; to the President of Yale College in Connecticut, to the Secretary of the Smithsonian Institute at Washington, D. C., and to Alexander Mercer Biddle, Alexander Mercer King, and Philip Mercer Rhinelander, should they or either of them then be alive, to be used by them for the establishment of scholarships or foundations in such colleges as they may select, for the benefit of such poor students as have passed through some of the public schools with the best reputation for character and ability. (3d.) One third ($\frac{1}{3}$) of said property to go to such works of religion or benevolence as my executors, after full consideration, shall select.

"SECTION XI. I appoint the Boards of Domestic Missions in the Protestant Episcopal and Presbyterian Churches in the United States my residuary legatees, so that in case any of my preceding gifts, specially my gifts to public purposes, should fail (for any reason now unimaginable by me), my property shall surely go, in such event, to the work of establishing the knowledge and follow-

ing of Jesus Christ among our American people. But in case there is no failure as to my purposes in the preceding bequests, and so these residuary legatees receive no substantial amount, then I call the attention of my executors to these two boards aforesaid as a proper object for the whole or a part of the third of my property which I have left to their appropriation for religious or benevolent purposes as aforesaid. And I desire that should any of my preceding public benefactions be named by any name it should be the name of ' Hall,' the name of my beloved mother and brother.

"In conclusion, it is my earnest desire that by the wisdom, honor, and energy of my executors, and of the persons intrusted with the several trusts aforesaid, my property may go in the most prudent, economical, and effectual manner to the permanent good benefit of men in case of the bequests to public objects, and in case of the bequests to persons to their comfort and happiness. I have chosen the Pennsylvania Company for Insurance on Lives and Granting Annuities for the position of trustee, because I thought it might be the safest and best trustee ; but if my executors aforesaid know of any company safer and also more capable and economical in charges, then I empower them to select such trustee for the trust in place of the Pennsylvania Company.

"This will is written on two sheets of eight pages, united at second and third pages by the words ' Protestant Episcopal Church,' and at the 6th and 7th pages by the words ' in case any of my preceding gifts;' on the first page there is one marginal and one interlined addition, on the second page the figures $1,000 are interlined, on the third page three names are added in margin, on the fourth page there is one erasure on the sixth line, on the fifth page there is an erasure on the fourth line and the word 'half' interlined, and an interlineation above the fourth line from the bottom, on eighth page an erasure on seventh line, all of which changes or additions were made by me before the signing and witnessing the will.

"And now in witness of the foregoing will I hereunto set my hand and seal this 28th day of September, in the year of our Lord 1870, at the city of Newport, Rhode Island.

"A. G. MERCER, [Seal.]

" Signed, sealed, acknowledged, and declared to be his last will and testament in the presence of all of us whose names are here signed in presence of each other.

" JOB T. LANGLEY, [Seal.]

" JAMES B. FINCH, [Seal.]

" ALEX. N. BARKER, [Seal.] "

The complainant asked the instructions of the court on the following state of facts as set forth in her bill :

" And your oratrix further shows to your Honors that the estate of the said testator consists almost wholly of personal property, a schedule of which is hereto annexed marked Exhibit B.

" And your oratrix further shows to your Honors that a large portion of said estate, to wit, many of the shares of stock, some of the railroad mortgages, the note and mortgage of Anna Pell and the bond and mortgage of Duncan C. Pell, all mentioned in said schedule, were acquired by the said testator after the execution of his said last will and testament.

" Your oratrix further shows that the only bonds of the State of California now outstanding are as follows :

" 1st. Soldiers' Relief Bonds dated 1863, amount $95,500, carrying interest at seven per cent. and maturing in 1883.

" 2d. State Capital Bonds dated 1870 and 1872, amount $500,-000, carrying interest at seven per cent. and maturing in 1885.

" 3d. Funded Debt Bonds dated 1873, amount $2,796,000, carrying interest at six per cent. and maturing in 1893.

" But your oratrix also shows that the said State of California holds in trust for school and university funds the above named $500,000 Capital Bonds and also $2,690,000 of the above named Funded Debt Bonds, which the said State has no power to divert from the purposes of the said trust, and that there are therefore only available for purchase the said $95,500 of Soldiers' Relief Bonds which mature in 1883, and $100,000 of the Funded Debt Bonds due in 1893, which said bonds can only be purchased at 'a very high price, which would speedily become very much higher if it were known that the estate held by your executrix was to be invested in them.        .        .        .        ..        .

" And your oratrix further shows to your Honors that some of the bonds mentioned in Exhibit B are worth on the market more

than their par value, but that the premiums thereon fluctuate from time to time.

" And your oratrix further shows that there is no ' Society for the Aged and Infirm (Women or Men) in Newport,' but there is a corporation incorporated as the ' Association for the Aid of the Aged,' established in the said city of Newport, the objects of which are the charitable relief of poor aged and infirm persons, and now by recent change of name called ' The Townsend Aid for the Aged.'

" And your oratrix further shows unto your Honors that there are no such persons as the ' Managers or Directors of the Pennsylvania Hospital (on Pine Street) in Philadelphia,' nor is there any corporation known by that name, but there is a hospital on Pine Street, in the city of Philadelphia, in the State of Pennsylvania, which is controlled by ' The Contributors to the Pennsylvania Hospital,' which is the corporate name of a corporation established under the laws of said State of Pennsylvania, which said corporation claims that it is meant by the said testator; that there is no such person as ' The President of Harvard University in Cambridge, Mass.,' but that one Charles W. Eliot, who resides in Cambridge, Massachusetts, holds the office of president of a corporation known as ' The President and Fellows of Harvard College,' which said corporation is organized under the laws of the State of Massachusetts and is established in said Cambridge, and that said Charles W. Eliot claims that he and his successors in said office of president are meant by the term used by the said testator; that there is no such person as ' The President of Yale College ' in Connecticut, but that one Noah Porter holds the office of president of a corporation organized under the laws of the State of Connecticut, established in the city of New Haven, in said State, known as the ' President and Fellows of Yale College,' and that said Noah Porter, who resides in said New Haven, claims that he and his successors in said office of president are meant by the term used by the said testator; that there is no such person as ' The Secretary of the Smithsonian Institute at Washington, D. C.,' but that one Spencer F. Baird, who resides in the city of Washington, in the District of Columbia, holds the office of secretary of a corporation organized under the laws of the United States, and established

in the said city of Washington, and known as the 'Smithsonian Institution,' and that said Spencer F. Baird claims that he and his successors in said office of secretary are meant by the term used by the said testator; that there are no such corporations or boards styled ' The Boards of Domestic Missions in the Protestant Episcopal and Presbyterian Churches,' but that there are two corporations organized under the laws of the State of New York, established in the city of New York, and known respectively as ' The Domestic and Foreign Missionary Society of the Protestant Episcopal Church in the United States of America,' and ' The Board of Home Missions of the Presbyterian Church in the United States of America,' which corporations claim that they are meant by the terms used in the eleventh section of said last will and testament.

" And your oratrix shows to your Honors that the said last will and testament is uncertain in many respects, and that she needs the advice and direction of this honorable court in regard thereto, and more especially in regard to the following questions :

" *First.* Do such shares of stock and bonds as were acquired after the execution of said last will and testament, and the bond and mortgage of Duncan C. Pell, and the note and mortgage of Anna Pell, mentioned in Exhibit B, pass under Section IX. of said last will and testament, or did the said Alexander G. Mercer die intestate as to such property ? And did the said Alexander G. Mercer die intestate of any of the property mentioned in said Exhibit B, and if so does such property pass to his next of kin or to the residuary legatees ?

" *Second.* Ought your oratrix to invest any part of the estate in her hands in bonds of the State of California as directed in Section II. of said last will and testament?

" *Third.* Shall your oratrix sell and dispose of any portion of the estate in her hands, and if so what shall she sell ?

" *Fourth.* In what property shall the said estate now and at all times hereafter be and remain invested ?

" *Fifth.* Are the persons named in Section IX. of said last will and testament entitled to receive the income of the estate in the hands of your oratrix from and after the decease of the said Alexander G. Mercer ? And if not entitled to all the income of the said estate as now invested, to what income, if any, are they

entitled from and after said decease, and how long shall such income continue to them?

"*Sixth.* In what manner shall the selection of the 'works of religion and benevolence,' to which the one third of the estate in remainder is to be devoted under the tenth section of said last will and testament, be expressed? And who are the persons who shall make the said selection?

"*Seventh.* Shall the said legacy to the Society for the Aged and Infirm (Women or Men) in Newport be paid to the said 'The Townsend Aid for the Aged?'

"*Eighth.* What is meant by the term 'The Managers or Directors of the Pennsylvania Hospital (on Pine Street) in Philadelphia?'

"*Ninth.* What is meant by the term 'The President of Harvard University in Cambridge, Mass.?'

"*Tenth.* What is meant by the term 'The President of Yale College, in Connecticut?'

"*Eleventh.* What is meant by the term 'The Secretary of the Smithsonian Institute at Washington, D. C.?'

"*Twelfth.* Does the expression 'Should they or either of them then be alive,' used in Section X. of said will, refer to the persons now holding the offices mentioned therein as well as to the said Alexander Mercer Biddle, Alexander Mercer King, and Philip Mercer Rhinelander, and in case of the death of all said persons before the death of the last of all the persons entitled during their lifetime to the income of the estate as directed in Section IX. of said will, did the said Alexander G. Mercer die intestate as to the one third of his estate so bequeathed to said persons?

"*Thirteenth.* Have the said corporations 'The Domestic and Foreign Missionary Society of the Protestant Episcopal Church in the United States of America,' and 'The Board of Home Missions of the Presbyterian Church in the United States of America,' any interest, vested or contingent, in the estate of the said Alexander G. Mercer? And if so what interest and how shall it be exercised?

"And your oratrix further shows unto your Honors that a difference of opinion exists between the next of kin of the said Alexander G. Mercer on the one hand, and the persons and corporations

mentioned in Sections IX., X., and XI. of said last will and testament on the other hand, as to the correct answer to be given to the first question herein stated ; that a difference of opinion exists between the persons mentioned in Section IX. of said will on the one hand, and the persons and corporations mentioned in Sections X. and XI. on the other hand, as to the correct answers to be given to the second, third, fourth, and fifth questions herein stated ; that a difference of opinion exists between your oratrix on the one hand, and the persons named as executors of said will on the other hand, as to the correct answer to be given to the sixth question herein stated ; that a difference of opinion exists between the said ' The Townsend Aid for the Aged ' on the one hand, and the persons and corporations mentioned in Sections IX., X., and XI. of said will on the other hand, as to the correct answer to be given to the seventh question herein stated ; that a difference of opinion exists between the said ' The Contributors to the Pennsylvania Hospital ' on the one hand, and your oratrix on the other hand, as to the correct answer to be given to the eighth question herein stated ; that a difference of opinion exists between the next of kin of the said Alexander G. Mercer on the one hand, and the said Charles W. Eliot, Noah Porter, and Spencer F. Baird on the other hand, as to the correct answers to be given to the ninth, tenth, eleventh, and twelfth questions herein stated ; and that a difference of opinion exists between the said next of kin on the one hand, and the said corporations ' The Domestic and Foreign Missionary Society of the Protestant Episcopal Church in the United States of America ' and ' The Board of Home Missions of the Presbyterian Church in the United States of America ' on the other hand, as to the correct answer to be given to the thirteenth question herein stated."

*Providence, March* 6, 1884. DURFEE, C. J. This is a bill for instruction in regard to the execution of the will of Alexander G. Mercer, late of Newport, deceased. By the first clause of the will the complainant and Edward King of Newport, and Frederick W. Rhinelander of New York, are appointed executrix and executors, and, in case of the failure of either of them, John J. Townsend of New York as substitute. Edward King died before the testator, and, the other executors named having failed to qualify, the complainant has instituted the suit alone.

The property of the testator amounted, at his decease, to nearly a million of dollars. It consisted of some real estate, of his personal effects, of a note for $10,000, secured by mortgage given by the complainant, of $136,455.19 in money, and of stocks and bonds. The will is in eleven sections. It does not expressly direct the payment of debts. It expresses the hope that the executors will accept a thousand dollars each in lieu of all other remuneration, giving as a reason that the testator regards the execution of his will as " a work of charity as well as of friendship." It makes numerous pecuniary bequests, one of five thousand, three of two thousand, and the rest of one thousand and of five hundred dollars each, to individuals and to religious, charitable, and literary societies or corporations. It gives his real property, consisting of a building called All Saints Church in Newport, to trustees in trust for the purposes and uses of religious worship according to the forms of the Protestant Episcopal Church in the United States of America. It gives certain articles, precious to the testator on account of their associations, to two of his friends as souvenirs, and then bequeaths " all the rest of my personal effects, such as silver, jewelry, furniture," &c. to the complainant, desiring her, however, to present from the testator to each of his friends some book or other article at her discretion, naming many whom he wishes her to remember. The will declares that the testator does not leave any share of his property to his brother John C. Mercer, " because he will need none of it," but requests him to accept two marble lions " with every kind and earnest good wish." The will then by Section IX. makes provision in regard to certain other property ; whether it be all his other property is one of the questions which we are asked to decide. The testator divides it into thirty shares, to be held and managed in trust, with direction that the interest on all the shares but two shall be paid to certain persons for life, and that the interest on the remaining two shall be paid to four cousins of the testator until the decease of his brother John C. Mercer. The will then provides by Section X. that, on the death of each of the legatees named in Section IX., his or her share of interest shall accumulate until the death of the last of said legatees, and that then the property with its accumulations shall be divided in three equal parts, and be distributed or applied to differ-

ent religious, educational, charitable, or benevolent purposes. The eleventh and last section appoints the Boards of Domestic Missions in the Protestant Episcopal and Presbyterian Churches of the United States "residuary legatees, so that," in the language of the will, "in case any of my preceding gifts, specially my gifts to public purposes, should fail (for any reason now unimaginable to me), my property shall surely go, in such event, to the work of establishing the knowledge and following of Jesus Christ among our American people." "In conclusion, it is my earnest desire," says the will, "that by the wisdom, honor, and energy of my executors, and of the persons intrusted with the several trusts aforesaid, my property may go in the most prudent, economical, and effectual manner to the permanent good benefit of men in case of the bequests to public objects, and in case of the bequests to persons to their comfort and happiness." This analysis exhibits the general scope and scheme and the more salient features of the will, and, if the entire property of the testator be disposed of, demonstrates a purpose on his part to dedicate by permanent trusts much the larger portion of his large means to the temporal relief and amelioration and to the moral, intellectual, and religious improvement of his fellow men.

The will, which is holographic, bears the date of September 28, 1870. The testator died November 3, 1882. In the *interim* between the date of his will and his death he largely increased his property. The bill but slightly shows the circumstances under which the will was made. It does not tell us what was the age, character, habits, or profession of the testator. We infer from the will, however, that he was a clergyman, for he bequeaths his sermons in it, and that he was a man of mature age, of superior education, of large views and of considerable knowledge of and capacity for business and finance. We also infer from this distribution of bequests and souvenirs that he was a man of genial and affectionate temper, who valued his friends and was glad to have them know that he valued them. The bill shows that the only next of kin of the testator who survived him were his brother John C. Mercer, and his three nieces, daughters of his brother Singleton Mercer. The bill shows that John C. Mercer was a man of large fortune, a fact recognized in the will, and that

the three nieces are legatees to the extent of $2,000 each under Section III.

The bill presents thirteen questions under the will on which it asks for instruction from the court. The first question is virtually whether the testator died intestate as to any of his property. The answer to this question depends mainly on the interpretation which is to be put upon certain language contained in Section IX., taken in connection with Section II. Section II. reads as follows, to wit:

" Section II. I desire my executors to select from my stock investments such of them as it may be most judicious to sell, and to realize from such sales enough money to pay the gifts made in Section III., and afterwards and gradually and to the best advantage to sell all my shares of stock, and to invest the proceeds in the bonds of the State of California, and to deposit said bonds, together with all my other bonds, with the 'Pennsylvania Company for Insurance on Lives and Granting Annuities,' in the city of Philadelphia, for the purposes hereinafter named."

Sections IX. and X. contain the general residuary bequest, if there be any such, for though the eleventh section appoints the Boards of Domestic Missions in the Protestant Episcopal and Presbyterian Churches residuary legatees, it appoints them such only to a limited extent: in so far, namely, as bequests made in preceding sections fail. The following is the language of Section IX., which is pertinent to our present inquiry, to wit: "All my property over and above the gifts made in the preceding sections, consisting of the bonds I now hold or may acquire, and the bonds of the State of California to be purchased by the sale of my stocks as aforesaid, and all of which is to be deposited as aforesaid with the said Pennsylvania Company of Insurance, &c., I divide into thirty (30) shares, to be held and managed by said company, *in trust*, to pay the interest on these shares to the following persons for the term of their natural lives, to wit: to pay," &c., naming the legatees for life. The principal of the property, the interest of which is given by Section IX., is, as before stated, disposed of by Section X.

We do not find anything in the will to take it out of the ordinary rule that a will speaks in regard to personal property from

the death of the testator, unless it appears affirmatively that it speaks from some other period ; and we therefore cannot discover any ground for contending that the stock and bonds belonging to the testator at his decease did not all pass, unless the provision for investment in California bonds, which we will consider later, may be found to be an insuperable obstacle. The next of kin contend that the only personal property which passes by the will, in addition to what is specifically bequeathed, is that which was invested at the death of the testator in bonds and stocks, and that as to all the rest the testator died intestate. The argument for this rests on the restrictive effect attributed by the next of kin to the words, " consisting of the bonds," &c., in the language of Section IX. above recited. The contention is that the purpose of these words is to limit the generality of the preceding words, and so to confine the testamentary operation of Sections IX. and X. to the bonds which the testator had when he died, and to the stocks then belonging to him which he directs his executors to sell for reinvestment in California bonds. Doubtless the words ought to have this restrictive effect if they were intended to have it. There are two ways of regarding them. One way is to regard them as intended to be restrictive. The other way is to regard them as intended to be enumerative and as failing in completeness of enumeration. When they are regarded in the latter way the testator is supposed to have used the words, " all my property over and above the gifts made in the preceding sections," in all their plenitude of meaning, with the intent of disposing of the entire *residuum* of his personal estate, and that, having used them with that intent, he added by way of enumeration or description the words, " consisting of the bonds," &c., and unwarily failed to accomplish a complete enumeration or description. The question is which of the two ways is the true way.

It is reasonable to suppose that a man who makes his will does not intend to die intestate as to any part of his property, and hence courts are reluctant to construe a will so as to allow a partial intestacy if they can avoid it. *Lett* v. *Randall*, 10 Sim. 112, 115 ; *Vernon* v. *Vernon*, 53 N. Y. 351, 361 ; *Raudenbach's Appeal*, 87 Pa. St. 51. This reluctance becomes stronger when, as here, the bequest which gives rise to the claim of partial intestacy is re-

siduary, or is in the nature of a residuary bequest. *Pearman* v. *Pearman*, 33 Beav. 394, 396; *Leake* v. *Robinson*, 2 Meriv. 363, 392; *Staples & Pearce, Trustees*, v. *De Wolf et als.* 8 R. I. 74, 120. We think, too, the disposition displayed by the testator in his will may be taken into account. It was evidently a pleasure to him to remember his friends in his will, and he was not likely to forego it, even in the case of his next of kin, for the more inexpressive form of benefaction by partial intestacy. Moreover, he gave to all of his next of kin except his brother, and he excused himself for not giving to his brother on the ground that his brother did not need any share of his estate. The excuse is inconsistent with an intent to benefit him by partial intestacy. The will contains other significant indications. He appoints the Boards of Domestic Missions residuary legatees, to take if any of the preceding legacies happen to fail; so that what he calls " my property," using the words without any restriction, may go according to his charitable intent. And afterwards he employs the same words still more emphatically, repeating the wish that " my property " may go " to the permanent good benefit of men." It seems very clear, therefore, that he did not intend to die partly intestate, and of course if he did not intend to do it, we ought not to decide that he has done it, unless his language leaves us no other alternative.

There are numerous cases in which words like those on which the next of kin rely have been construed to be words of defective description or enumeration. We refer to the following, cited in the order of their dates by Mr. Gray, counsel for some of the charity legatees. *Bridges* v. *Bridges*, 8 Vin. Abr. 295, A. D. 1729; *Cambridge* v. *Rous*, 8 Ves. Jun. 12, 26, A. D. 1802; *Chalmers* v. *Storil*, 2 Ves. & Bea. 222, A. D. 1813; *Ellis* v. *Selby*, 7 Sim. 352, A. D. 1835; *Fisher* v. *Hepburn*, 14 Beav. 626, A. D. 1851; *Drake* v. *Martin*, 23 Beav. 89, A. D. 1856; *In re Goodyear*, 4 Jurist N. S. 1243, A. D. 1858; *Gover* v. *Davis*, 7 Jurist N. S. 399, A. D. 1861; *Dean* v. *Gibson*, L. R. 3 Eq. 713, A. D. 1867; *King* v. *George*, L. R. 4 Ch. Div. 435; also, L. R. 5 Ch. Div. 627, A. D. 1871; *Mullally* v. *Walsh*, L. R. 3 Ch. Div. 244, A. D. 1879; *Sidgreaves* v. *Brewer*, L. R. 15 Ch. Div. 594, A. D. 1880. The case of *Dean* v. *Gibson* is exactly in point. There a market woman made her will shortly before her death, bequeath-

ing her " personal property, consisting of money and clothes," and it was held that the words " consisting of money and clothes " did not cut down the gift, being merely imperfect enumeration. In *Clark* v. *Preston*, 2 La. An. 580, a will, after divers bequests, gave " the rest and residue of my estate," and it was held that the generality of the gift was not reduced by subsequent words averring that " this residue will consist of notes due to me at New Orleans." " It is safer to adhere to the general rule," says James, L. J., in the analogous case of *King* v. *George*, *supra*, " that clear words of gift must have their full effect unless a clear intention is shown to cut them down." We wish likewise to call attention particularly to the elaborate opinion delivered by Vice Chancellor Malins in *King* v. *George*, as reported in L. R. 4 Ch. Div. 435. Our own case of *Goddard* v. *Brown*, 12 R. I. 31, 41, 42, which has been alluded to as holding another doctrine, was different in character. The words, " consisting of all my interest and shares," on which there the question was raised, were regarded by the court as simply expository and parenthetical.

The will here, drawn by the testator himself, probably without professional advice, is somewhat inartificial in structure and neglectful of detail. It makes no provision for the payment of debts, funeral expenses, or the expenses of administration, though, in its solicitude for the interests of its purposed charities, it requests the executors not to charge over one thousand dollars each for their services. The testator, after remembering his friends, seems to have given his mind wholly to the contemplation of the great charities which he was instituting, and which he meant to have remain forever for " the permanent good benefit of men." It is probable that the creation of these charities had been a long cherished project with him, and that he had been long accumulating for them the bonds and stocks which he held. When therefore, in giving to them the residue of his estate, he incidentally went on to describe that residue, he naturally mentioned what was uppermost in his mind, namely, the bonds and stocks which he had long associated with the charities which he intended to found. It is our duty in construing the will to throw our minds back to the time when it was made. His investments then, so far as appears, consisted entirely of bonds and stocks, and there is no reason to suppose that

he had any considerable amount of cash on hand. We are not informed what his habit was, but, judging from the indications of the will, it is not likely that it was his habit to keep any considerable amount of money earning little or nothing ; and he may have thought when he made his will, if he then gave the matter a passing thought, that his idle cash would never amount to more than the executors would require for the purposes which he left them to attend to without express provision. We conclude therefore, notwithstanding the very able argument submitted for the next of kin, that the residue in Sections IX. and X. is not to be limited to bonds and stocks, but includes everything, not included in preceding devises or bequests, over which the testator had the right of disposition.

One matter more remains for consideration before we pass to the second question. Section II. directs, or rather desires, the executors to sell the stocks and reinvest the proceeds, not required for the payment of legacies under Section III., in California bonds. Section IX. directs that the California bonds so procured shall constitute a part of the trust fund for Sections IX. and X. The bill shows that, owing to the present paucity of California bonds, the direction to sell and reinvest in them is no longer feasible. The next of kin contend that, inasmuch as the stocks cannot be converted according to direction, there is as to them an intestacy. We do not think this conclusion follows. The rule is that where the general intent is clear, it will be carried out at the expense of any particular intent which cannot be carried out consistently with it, the paramount purpose being entitled to prevail. *Lessee of Findlay* v. *Riddle*, 3 Binney, 139, 162. *Parks* v. *Parks*, 9 Paige, 107 ; *Purnell* v. *Dudley*, 4 Jones Eq. 203 ; *Jesson* v. *Wright*, 2 Bligh, 1, 56. In the case of *Thellusson* v. *Woodford*, 4 Ves. Jun. 227, 329, it was said that the court is bound to carry the will into effect if they can see a general intention which is consistent with the rules of law, even if the particular mode pointed out by the testator is illegal. *Bartlet* v. *King*, 12 Mass. 537, 553 ; *Inglis* v. *The Trustees of the Sailors' Snug Harbor*, 3 Peters, 117, 118. Another rule is that when a will cannot operate to its full extent it shall take effect as far as possible. *Thellusson* v. *Woodford*, 4 Ves. Jun. 227, 325. In the case at bar the general intent or par-

amount purpose is clear and it can be carried out, not precisely in all respects in the manner indicated by the testator, but in a manner which is substantially as good. It seems clear to us therefore, in accordance with the rules before mentioned or with the principles underlying them, that the general or paramount intent must not be permitted to fail merely because it is coupled with a particular or subsidiary intent which is impracticable. Indeed the mere fact that the will is a will ought to be enough to save it from such miscarriage. The testator himself seems to have regarded the conversion of his stocks into California bonds as simply means to an end which might or might not be adopted, for his language is " I desire," not " I direct." Evidently what he wanted was a safe investment, yielding a fixed income. *Moggridge* v. *Thackwell*, 7 Ves. Jun. 36, 68.

The second, third, and fourth questions may be considered together. They are as follows, namely :

" *Second.* Ought your oratrix to invest any part of the estate in her hands in bonds of the State of California as directed in Section II. of said last will and testament ?

" *Third.* Shall your oratrix sell and dispose of any portion of the estate in her hands, and if so what shall she sell ?

" *Fourth.* In what property shall the said estate now and at all times hereafter be and remain invested ? "

The second question has been virtually answered already. The bill shows that bonds of the State of California are practically unavailable. It is not obligatory on the complainant to invest in them and she ought not to do it. The testator probably preferred bonds to stocks, because good bonds would yield a more uniform income for the legatees for life. We think therefore, if any of the stocks left by the testator are ineligible as an investment, or if they pay only irregular or precarious dividends, that they ought to be sold and the proceeds reinvested in safe bonds, preference being given to state bonds, but not in bonds which command too high a premium because they yield a high rate of interest, since that would be to benefit the life legatees unfairly at the expense of the permanent fund. We think the executrix is entitled to the assistance of the court in determining what changes of investment should be made and into what they should be made, and we will

therefore send the cause to a master on that point. We cannot undertake to give instructions in regard to future investments or reinvestments; for we know not what the future may bring.

The fifth question is this: Are the persons named in Section IX. entitled to receive the income of the estate from and after the decease of the testator? Section IX. bequeaths a *residuum*, divided into thirty shares, to trustees, in trust, to pay the interest on them to certain persons during their lives, the number of shares which is to yield the interest to each person being specified. We do not think that under this bequest the life legatees can justly lay claim to anything more than the income, or what is equivalent to the income, of the *residuum*; and we can see no good reason why they should not have that amount of income, less its proper part of the taxes, from the death of the testator, under the decision of this court in the case of *Bailey, Petitioner*, 13 R. I. 543, 560, unless the direction to convert the stocks into California bonds makes a material distinction. In the case of *Bailey, Petitioner*, we adopted and applied the rule laid down by the Supreme Judicial Court of Massachusetts in *Lovering* v. *Minot*, 9 Cush. 151, where it was held that in the case of a bequest of a *residuum* to trustees, in trust, to pay the income to legatees for life with remainder over, the life legatees are entitled to the actual income from the death. The only question therefore is whether the rule shall be varied by reason of the direction to convert. In the view which we have taken of the will the direction is merely subsidiary to the trust, not constitutive of it. We can discover no good reason why such a direction in such a case should vary the rule, even in regard to the portion of the estate to which it relates. Plain rules ought not to be obscured by unnecessary exceptions. The following cases support us in regarding the direction as immaterial: *Hewitt* v. *Morris*, Turn. & R. 241; *Angerstien* v. *Martin*, Turn. & R. 232; *Douglas* v. *Congreve*, 1 Keen, 410; *Mackie* v. *Mackie*, 5 Hare, 70; *Wrey* v. *Smith*, 14 Sim. 202; *Sargent* v. *Sargent*, 103 Mass. 297; *Hilyard's Estate*, 5 W. & Serg. 30. The general rule and the ground of it are well stated by Judge Redfield in his work on Wills. "Where the bequest is of a residue to one for life, and *then* over," he says, "the *corpus* of the fund vests, both in the tenant for life and those entitled in remainder, ordina-

rily, at the decease of the testator ; and the true rule seems to be, that for the first year the tenant for life shall be entitled to all the interest earned by the fund, as invested at the decease of the testator, until it can be permanently invested, which will commonly be at the end of the year." 2 Redfield on Wills, 2d ed. 472.

A question which has been discussed, as incidental to the fifth question, is : What rate of interest shall be paid permanently to the life legatees, in view of the fact that the trust fund, when set apart, will consist largely of what are termed wasting securities, *i. e.* of bonds which are above par and will sooner or later run out ? The contention is that the life legatees, if the interest be paid to them at the rate which is stipulated in the bonds, will get under the denomination of interest a part of the capital of the trust fund. In England the chancery courts have attempted to remedy this by requiring the trustees to convert the wasting securities into consols, or to reserve a part of the interest to be added to the principal. *Howe* v. *Earl of Dartmouth*, 7 Ves. Jun. 137, 140, 141, 151, 152 ; *Gibson* v. *Bott*, 7 Ves. Jun. 89, 95 ; *Dimes* v. *Scott*, 4 Russ. 195 ; *Brown* v. *Gellatly*, L. R. 2 Ch. App. 751. It does not appear that this practice has ever been resorted to in this country, though occasions for it must often have occurred. We do not think we need resort to it here, for the present at least. The testator meant to have the trust fund, when fully constituted, consist of bonds which he had acquired and left, and of California bonds to be acquired by his executors by a conversion of his stocks. He divides this fund into thirty shares, and directs his trustees to pay the interest on certain specified shares to certain persons. We think there can be no doubt that what he means by the interest is the interest on the bonds, as stipulated in them. The case therefore falls within the rule laid down in *Brown* v. *Gellatly*, *supra*, that, where the trust fund consists of investments which are authorized by the will, the life legatees are entitled to the whole of the actual income ; for we think any bonds or stocks bought or retained in lieu of the California bonds must be regarded in the same light. Indeed the bequest here, though residuary, has mainly in this respect the character of a specific bequest, the entire produce or usufruct of which belongs, as a matter of right, to the life tenant. *Kinmonth* v. *Brigham*, 5 Allen, 270. We

think therefore that, for the present, the entire interest should go without abatement to the legatees for life. Whether, after the bonds now acquired or to be acquired have run out, the new investments for the fund ought to be treated in the same way, is a question which it will be time enough to answer when it arises.

The sixth and the thirteenth questions may be considered together, since they both relate chiefly to the one third of the trust *residuum* in remainder, which is disposed of under Section X. of the will in the following manner, to wit: " One third ($\frac{1}{3}$) of said property to go to such works of religion or benevolence as my executors, after full consideration, shall select."

The sixth question is: " In what manner shall the selection of the works of religion or benevolence, to which the one third of the estate in remainder is to be devoted under the tenth section of said last will and testament, be expressed? And who are the persons who shall make the said selection? " The thirteenth question is: " Have the said corporations, ' The Domestic and Foreign Missionary Society of the Protestant Episcopal Church in the United States of America,' and ' The Board of Home Missions of the Presbyterian Church of the United States of America,' any interest, vested or contingent, in the estate of the said Alexander G. Mercer? And if so what interest, and how shall it be exercised? " Under the head of these two questions several questions of great interest have been raised and argued with great ability.

There is, however, a preliminary question, namely, whether the two corporations mentioned in the thirteenth question are the " residuary legatees " designated in Section XI. of the will under the name of " The Boards of Domestic Missions in the Protestant Episcopal and Presbyterian Churches in the United States " ? The bill shows that there are no boards existing under that name, but that there are two corporations organized under the laws of New York and established in the city of New York, having the names mentioned in the thirteenth question, which claim that they are meant by the designation used in Section XI. The two corporations may be right in their claim, but we do not think enough appears for us to decide so. Section XI. of the will does not specify the locality of the boards there indicated, otherwise than

that they are in the United States, and for anything that appears there may be other boards or bodies in the United States which correspond more clearly to the designation used in Section XI. than the two corporations mentioned in the thirteenth question. But assuming that they are the legatees which were intended by Section XI., they are of course entitled to take as there provided. We will for our present purposes so assume.

The contention of the two corporations is that the bequest to such works of religion or benevolence as the executors shall select is void : *first*, because it is too vague and indefinite to be sustained, and, *second*, because it cannot be sustained as a charity, for the reason that it extends to purposes which are not technically charitable. The contention on the other hand is that the bequest is a gift to charitable uses, valid as such notwithstanding its indefiniteness.

We think it will be well for us, before considering these points, to state briefly how far in our opinion the law of charitable uses, as administered in the English chancery courts, is the law of Rhode Island. It was generally supposed at one time, in this country, that the law of charitable uses, as distinguished from the law of ordinary trusts, owed its existence to the statute of 43 Elizabeth, cap. 4. The supposition is now known to have been erroneous. It is understood now that that statute, except in its remedial provisions, was simply declaratory of the preëxisting common law. It is also understood that the English chancery courts had, long anterior to the statute, exercised jurisdiction over charitable uses. The differences in the jurisdiction, as it was applied to charitable uses and to ordinary trusts, were owing chiefly to the differences between such uses and such trusts. A trust for private or non charitable purposes cannot be upheld unless the purposes are quite clearly defined. Such a trust is invalid if it violates the rule against perpetuities. A trust for charitable uses is favored in both these respects. Though indefinite it is upheld. If it be designed to be perpetual it is perpetuated. It is a matter of public policy to conserve it from failure. Under this policy a jurisdiction has grown up which has sometimes been condemned as ultra judicial. Thus, if a trust be created for charitable purposes which are too vaguely defined to be executed without further definition, the court

itself, if a discretionary power be not lodged elsewhere, will devise a scheme for carrying it into effect. So if a trust be designed for a purpose which is accomplished before it becomes available, or is impracticable, the court will sometimes, though not always, apply it to some other proximate purpose. And again in the case of a trust which has been long in existence, if, by change of circumstances, it ceases to be useful according to its original intent, it will be reapplied either wholly or in part to some new purpose, as nearly like to the old as possible. This is what is known as the *cy pres* jurisdiction. It is sometimes confounded with the prerogative power which is exercised by the chancellor in England in particular cases under the sign manual of the sovereign as *parens patriæ*. It is not clear that a resort to this last named power is necessary in more than two classes of cases, to wit : when the bequest is to particular uses charitable in their nature but illegal, and when the bequest is to charity generally without any trust interposed, and no power exists in any person to appoint trustees. *Jackson* v. *Phillips*, 14 Allen, 539 ; *Moggridge* v. *Thackwell*, 7 Ves. Jun. 36, 83 ; but see *Felan* v. *Russell*, 4 Irish Equity Reports, 701. We are not aware that any American court has ever claimed the power in so far as it may be regarded as a purely prerogative or *parens patriæ* power.

There is no branch of the law which has been more diligently explored than that which relates to charitable uses and to the exercise of the *cy pres* power. The result has been to create or confirm the belief that the power, apart from the prerogative power, is a regular chancery power, and that there is no reason why any court, invested with full chancery powers, and untrammelled by precedent or legislation, should not assume and exercise it. The progress of this belief in the Supreme Court of the United States is very instructive. *Baptist Association* v. *Hart's Executors*, 4 Wheat. 1 ; *Vidal et al.* v. *Girard's Executors*, 2 How. U. S. 127 ; *Russell* v. *Allen*, 17 Otto, 163. The Supreme Judicial Court of Massachusetts has accepted it with hearty faith, the opinion on the subject in *Jackson* v. *Phillips*, 14 Allen, 539, 574, delivered by Mr. Justice Gray, being extremely able and learned. There are other states in which the same view has prevailed. *Estate of Hinckley*, 58 Cal. 457 ; *Academy of the Visitation* v.

*Clemens*, 50 Mo. 167 ; *Erskine* v. *Whitehead*, 84 Ind. 357 ; *Heuser* v. *Harris*, 42 Ill. 425 ; *Heskett* v. *Murphy*, 36 N. J. Eq. 304; *Clement* v. *Hyde*, 50 Vt. 716 ; Bispham's Principles of Equity, § 130. In this State there is no reported decision in which the doctrine of *cy pres* has been adopted, though the decision in *Brown et al., Trustees*, v. *Meeting Street Baptist Society*, 9 R. I. 177, rests upon principles which lie at the foundation of the docrine. There are, however, unreported cases in which the doctrine has been recognized or applied. The earliest of these of which we have any knowledge is the case of *William C. Gardiner et al.* v. *Kingston Academy*, decided in Washington County in 1840. The case involved the employment of a fund derived from a sale, authorized by the General Assembly, of certain lands in the Petaquamscut purchase conveyed in trust in 1695 by Judge Sewall and wife for the education of the youth of that purchase. The case was tried by the court, not by virtue of its general equity power, but under a special statute ; but in the course of its opinion the court refers to its power as a court of equity, and declares that if the scheme for the administration of the charity as settled by the opinion shall on experience turn out to be defective, it can be modified on representation made on the chancery side of the court, thus clearly recognizing the existence of a *cy pres* power in the court. In two other cases quite recently decided the power was not only recognized but applied without question. In one case [1] an ancient charity which had ceased to be useful as originally founded was applied to other purposes; and in the other case [2] a charity which could not be carried out as intended by the founder was settled in a different manner. Jurisdiction in equity is granted to this court by our statute in the broadest terms, Pub. Stat. R. I. cap. 192, § 8; and we see no reason to doubt that the *cy pres* power is included in the grant, in so far as it is a regular chancery power, unless it must be deemed to have been excluded because it is inconsistent with other legislation or with the settled policy of the State as evinced by other legislation. The general understanding

---

[1] *St. Michael's Church* v. *Willard Sayles, Attorney General.* Bristol County, May, 1882.

[2] *Attorney General* v. *City Council of Newport.* Newport County, March Term, 1882.

is, that a full grant of equity powers carries all the powers which are exercised by the English chancery courts acting within their regular jurisdiction.

We are aware that this conclusion is at variance with the conclusion which has been reached by the higher courts of some of the states. *White* v. *Fisk*, 22 Conn. 31 ; *Adye* v. *Smith*, 44 Conn. 60 ; *Green* v. *Allen*, 5 Humph. 170 ; *Lepage* v. *McNamara*, 5 Iowa, 124. The courts of these states regard the *cy pres* power with disfavor, as an excrescence on the law, sapping and perverting it, rather to be cut off than adopted. We think this view is erroneous. It ignores the difference between charitable and other trusts. Charity cannot be confined to the narrow channels, prescribed for other trusts, without detriment to its inmost character. It flourishes by diffusion. It belies itself when it contracts itself. Uncertainty is its native element. The contributor to a fund for the relief of sufferers by fire or flood or pestilence does not particularize. He trusts his contribution will go by preference where the need is sorest, but he commits it to the discretion of the distributor. We have here the *cy pres* power in its rudimentary form. It is not a pernicious excrescence, but the natural outgrowth of charitable trusts. If property be given in trust for a general charitable use, the question instantly arises, to what purposes shall it or the income of it be applied, and in what manner shall it be administered. A court of chancery answers the question by devising a scheme of administration. It does not permit the trust to fail because its particular purposes are uncertain, but furthers the general intent of the donor by defining them. We think there can be no doubt that when the court thus gives effect to the intent of the donor, instead of allowing it to be defeated, it fulfils a legitimate function. If, however, the trust is for some particular purpose which has been accomplished before the trust becomes available, or which is impracticable, there a *cy pres* application is more questionable ; but even then, if it be clear that a general charitable intent has simply taken form in a particular purpose, the court will best carry out the will of the donor by applying his donation to some other purpose which is as nearly as possible akin to the purpose which is named. Or, again, if some charity, founded to endure forever, after long diffusing its bless-

ings, languishes or becomes inoperative by change of circumstances, can there be a doubt that the court is carrying out the intention of the founder when it revives his charity by reapplying it, wholly or in part, to some new purpose of beneficence of kindred character with the old ? Surely not: yet this is only an exercise of that *cy pres* power which is so much decried. We know of but few things of earthly institution which more impressively proclaim the lesson of our common humanity than one of these ancient charities, which, descending from a remote past to a remote future, knitting the generations together, dispenses its good gifts continually by the way. It would certainly be a reproach to our civilization if, when such a charity ceases to be efficacious in the particular form which was given to it by its founder, there were no power to make it efficacious in some other form, in which it could still testify of the benevolent purpose in which it had originated. And we cannot think it is any sufficient answer to these considerations for the opponents of the power to tell us, that such a power may exist, but, if it exist, it is not a chancery or judicial power, but belongs rather, by reason of its arbitrary character, to the executive or legislative branch of the government. When we read the cases in which the English chancery courts have exercised the power, and remark with what scrupulous care and consideration, as a rule, they have endeavored to follow out the express or presumed paramount intention of the donors, and at the same time have studied to make it redound to the public good, we are constrained to think that the refusal to recognize the power as a true judicial power is determined mainly by a misconception of it.

The legatees under Section XI. contend that the bequest is invalid because the *cy pres* power of English chancery, which is necessary to the maintenance of indefinite charitable trusts, has never been adopted here and is inconsistent with the legislation of the State. They contend that in Rhode Island the founder of a charity, to make it good, must himself designate its specific purpose, appoint the trustees to execute it, and select or provide a constituency for selecting the beneficiaries. We think it unnecessary, after what we have said, to inquire further whether the power has been adopted here ; for it follows from what we have said that, unless it be inconsistent with other legislation, it must be held to

have been conferred in the general grant of chancery powers. The question is, then, is there any legislation inconsistent with it? The earliest statute of the State on the subject was passed in 1721. It is entitled "An act to redress the misemployment of property given to certain charitable uses," and was manifestly modelled after the statute of 43 Elizabeth, the town councils of the several towns being invested with the same sort of remedial powers as, under the statute of Elizabeth, were to be delegated to commissioners. Its object was to restore charity funds and estates which were being misemployed to their proper employment "to and for the charitable uses and intents of the donors." Appeals were allowed, at first, to the governor and council, later to the Supreme Court. The statute as originally passed had reference to only two classes of charitable trusts, namely, "for the relief of the poor or the bringing up of children to learning;" but in the Digest of 1844 it was extended to trusts "for any other specific purpose." The same Digest also added a new section, to the effect that nothing in the act should be construed to deprive the Supreme Court of original jurisdiction of the matters placed within the jurisdiction of the town councils, thus recognizing the fact that the court had jurisdiction over charitable trusts independently of the statute. The statute remained in force until 1872, when it was repealed.

The argument is that, inasmuch as the statute extended only to trusts "for the relief of the poor or the bringing up of children to learning or for any other *specific* purpose," therefore any trust which is indefinite in its terms is invalid. The logic is clearly inconclusive. The jurisdiction conferred was special. The town councils of the several towns were empowered to redress the misemployment of charity funds and estates, and to restore them to the uses for which they were given. Evidently they could not perform this function, if the uses were indefinite, without first defining them, or, in other words, without exercising the *cy pres* power, which was too delicate a power to be delegated to them. Naturally, therefore, the jurisdiction was limited to trusts for the two purposes mentioned, "or for any other specific purpose." Indeed, the extension of the jurisdiction in 1844 to trusts "for any other specific purpose" was of doubtful constitutionality. We think, therefore, that the inference that only such trusts are valid

as were within the purview of the statute is not legitimate. The conclusion is too broad for the premises. The same sort of logic would lead to the conclusion that prior to 1844 the only trusts which were valid were trusts " for the relief of the poor or for the bringing up of children to learning." This point was taken in *Potter* v. *Thornton*, 7 R. I. 252, 263, but it met with no favor from the court. It is incredible that the statute would have been permitted to drop entirely out of the statute books if it had been supposed to have the significance which is imputed to it.

The only other legislative provisions which are entitled to consideration here are Pub. Laws R. I. cap. 372, of March, 1861, and Pub. Laws R. I. cap. 625, of March, 1866. The earlier chapter provides for the appointment of trustees, whenever any trust created for any purpose, mentioned in the statute which we have just been considering, should become vacant, or cease to be administered, on application of any interested person. We cannot infer from it that only specific trusts are valid. Chapter 625 provides that, " in case the bill of complaint in any suit regularly instituted for the appointment of a trustee or trustees, or a new trustee or new trustees, for any charity or charitable or public purpose, shall allege substantially that the purposes expressed by the donor in and by the instrument creating the trust cannot be effectuated, the prayer of the bill may include, in addition to the other relief asked for, a prayer for a *cy pres* application of the trust property," and that the court may apply the property *cy pres* accordingly. The statute does not purport to confer the *cy pres* power, to be exercised by the court only under particular circumstances, but recognizes its anterior existence in the court, and provides that a bill in equity may be brought for the double purpose of procuring the appointment of new trustees and the *cy pres* application of the trust property. The statute is clearly against the proposition maintained by the legatees under Section XI., that the court has no *cy pres* power, and that indefinite charitable trusts are invalid in Rhode Island. Our conclusion is that the proposition is untenable.

The counsel, analyzing his first objection into separate points, contends that the bequest is void " because there is an absolute failure to specify : *first*, the trustees of the fund ; *second*, the classes

of objects and purposes of application of the fund; _third_, the beneficiaries of the fund ; and _fourth_, any method of selecting either trustees or beneficiaries." We do not think the first point is well founded in matter of fact. By Section IX. the _residuum_ is to be deposited with the Pennsylvania Company for Insurance and Granting Annuities, and, being divided into thirty shares, is "to be held and managed by said company _in trust_ to pay the interest on these shares" to certain persons for life. By Section X. the company is required to reinvest any interest which ceases to be payable under Section IX., and to accumulate it until the death of the last surviving life legatee, whereupon the entire fund is disposed of in equal thirds which are "to be paid" or "to go" as there bequeathed, the company being clearly charged by implication with the duty of paying them and causing them to go as bequeathed. The only admissible construction is that the company was intended to be made, and, subject to the power vested in the executors by Section XI. has been made, the trustee of the fund. As trustee it is to hold the fund at first for purposes which are clearly defined, and afterwards to cause the one third which is here in dispute "to go to such purposes of religion or benevolence as my executors, after full consideration, shall select." The other points taken amount simply to this, that the purposes of the bequest and the beneficiaries are not pointed out, and no means are provided by which they can be pointed out. This objection is certainly untenable if the executors qualify and exercise the power which has been committed to them, or if the executrix, who has qualified, can exercise it. _Going_ v. _Emery_, 16 Pick. 107 ; _Brown_ v. _Kelsey_, 2 Cush. 243 ; _Moore's Heirs_ v. _Moore's Devisees_, 4 Dana, 354 ; _Wilkinson_ v. _Lindgren_, L. R. 5 Ch. App. 570 ; _Horde_ v. _The Earl of Suffolk_, 2 Myl. & K. 59.

We now pass to the second ground on which the bequest is impugned, namely, that the bequest is not in terms limited to charitable uses, and is therefore void. It is well settled that if the property, bequeathed by so indefinite a bequest, can consistently with the will be applied to other than charitable uses, the bequest is invalid. In the case at bar the objection is, that the bequest is to such works of religion or benevolence as the executors may select, and that, consistently with this bequest, the entire fund

may be applied to works of benevolence which are not works of charity, for the reason that the word " benevolence " is a word of larger meaning than the word " charity," as it is understood in the law of charitable uses, and therefore, while it includes charitable purposes, may also include other purposes of mere personal good-will which are not charitable. We think it is well established by the clear current of authority that, if the word " benevolence " be used in its larger meaning, the bequest cannot be sustained; the fact that the bequest is in the alternative, " to works of religion *or* benevolence," being immaterial, inasmuch as, the bequest being in the alternative, it is in the power of the executors to apply the property wholly to works of benevolence, and, among such works, to works which are not technically charitable. *Morice* v. *The Bishop of Durham*, 9 Ves. Jun. 399, 405 ; *James* v. *Allen*, 3 Meriv. 17 ; *Mitford* v. *Reynolds*, 1 Ph. 185, 190 ; *Ellis* v. *Selby*, 1 Myl. & Cr. 286 ; *Williams* v. *Williams*, 5 L. J. N. S. Eq. 84; *Nash* v. *Morley*, 5 Beav. 177 ; *Kendall* v. *Granger*, 5 Beav. 300 ; *In re Jarman's Estate*, L. R. 8 Ch. Div. 584; Boyle on Charities, 281 *sq.* It does not follow, however, that the bequest is invalid because the word " benevolence " is used; for the question is a question not of language but of meaning, and it may appear by the context of the will, or by the will taken as a whole, that, though the word benevolence was used, the only thing which was intended to be denoted by it was charity. If it be clear that this was the meaning, the will must be executed in accordance with it. *Suter* v. *Hilliard*, 132 Mass. 412; *Rotch* v. *Emerson*, 105 Mass. 431 ; *Saltonstall* v. *Sanders*, 11 Allen, 446, 468; *Morice* v. *The Bishop of Durham*, 10 Ves. Jun. 522, 542, 543 ; *Whicker* v. *Hume*, 7 H. L. 124 ; *De Camp* v. *Dobbins*, 29 N. J. Eq. 36 ; Boyle on Charities, 286. The question then is : Was the word used in its larger meaning or in a narrower meaning as synonymous with charity ?

We have seen that the testator, by the first section of his will, appoints the executors and expresses a hope that they will be content with a thousand dollars each for their services, giving as a reason that he regards the execution of the will " as ,a work of charity as well as of friendship." There is reason to think that these two words, " friendship " and " charity," are the two keys,

so to speak, which fully unlock the meaning of every part of the will. The will is a will of friendship in so far as it contains bequests and directions in favor of particular persons; for the rest, it is a will and testament of charity. This character shows itself with special emphasis in Section XI. The testator there designates certain gifts as *public* gifts, evidently meaning the gifts not given to particular persons. He there appoints the boards of domestic missions to take any of his preceding gifts which may fail, " specially my gifts to *public purposes*." Again he speaks of this class of gifts as "*public benefactions*." He commends the boards of missions to his executors " as a proper object for the *whole* or a part of the third of my property which I have left to their appropriation for religious or benevolent purposes." This recommendation shows very clearly that what he meant was not any exhibition on the part of his executors of their mere personal favor or good will, but works for the general good of men without regard to persons. " In conclusion," he says, in words which throw a flood of light on his intention, and meaning, " It is my earnest desire that by the wisdom, honor, and energy of my executors, and of the persons intrusted with the several trusts aforesaid, my property may go in the most prudent, economical, and effectual manner to the *permanent good benefit* of men in case of the bequests to *public objects*, and in case of the bequests to persons to their comfort and happiness."

It is clear from these expressions that the works of benevolence intended by the testator were works for the public benefit. The counsel for the legatees under Section XI. contends that bequests for public purposes are not necessarily gifts to charitable uses. We think, however, that a gift for purposes which are both public and benevolent, particularly when it appears, as here it does appear, that the gift is inspired, not by any partisan or political motive, but by the simple love of men as men, and by a desire for their permanent good, must be regarded as a charitable gift. *Ould* v. *Washington Hospital for Foundlings*, 5 Otto, 303. Lord Hardwicke's definition of a charity was : " A gift to the general public use, which extends to the poor as well as to the rich." *Jones* v. *Williams*, Amb. 651. In *Attorney General* v. *Heelis*, 2 Sim. & Stu. 67, 76, Sir John Leach said he was of the opinion

" that funds supplied from the gift of the crown, or from the gift of the legislature, or from private gift, for any legal, public, or general purpose, are charitable funds to be administered by courts of equity." See, also, *Nightingale* v. *Goulburn*, 5 Hare, 484, 486 ; *Dolan* v. *Macdermot*, L. R. 5 Eq. 60 ; also L. R. 3 Ch. App. 676 ; *Attorney General* v. *The Earl of Lonsdale*, 1 Sim. 105 ; *Attorney General* v. *Webster*, L. R. 20 Eq. 483 ; *Drury* v. *Inhabitants of Natick*, 10 Allen, 169 ; *Townley* v. *Bedwell*, 6 Ves. Jun. 194. If the gift be charitable it is good however general. *Morice* v. *The Bishop of Durham*, 9 Ves. Jun. 405 ; *Horde* v. *The Earl of Suffolk*, 2 Myl. & K. 57 ; *Waldo* v. *Caley*, 16 Ves. Jun. 206 ; Perry on Trusts, § 705 and cases cited ; Bispham's Principles of Equity, § 119. See, also, Pub. Stat. R. I. cap. 178, § 6. Our conclusion is that the bequest is valid.

Other questions under the sixth question remain for consideration. Two of them arise from the fact that two of the persons named as executors have not qualified as such. The first is whether the persons who have not qualified are entitled, without qualifying, to participate with the executrix in exercising the power of selection given to the executors in regard to the one third of the *residuum* which is to go to works of religion or benevolence. We think they are not. The power is given by the testator to " his executors," not there named, and the persons nominated are not executors until they qualify as such. *Attorney General* v. *Fletcher*, 5 L. J. N. S. Eq. 75 ; *Keates* v. *Burton*, 14 Ves. Jun. 433. The second question is whether the executrix who has qualified can exercise the power. The question is not free from difficulty, but the more recent cases maintain the doctrine that where a discretionary power is given to executors, without naming them, it will, even when it relates to the realty, unless there be something else to show an intent to give it to them as individuals, vest in the qualifying or surviving executor. *Brassey* v. *Chalmers*, 16 Beav. 223 ; also 4 De G., M. & G. 528 ; *Houell* v. *Barnes*, Cro. Car. 382 ; *Weimer* v. *Fath*, 43 N. J. Law, 1 ; *Jennings* v. *Teague*, 14 S. Car. 229 ; *Chandler* v. *Rider*, 102 Mass. 268 ; *Gould* v. *Mather*, 104 Mass. 283. In *Attorney General* v. *Glegg*, Amb. 584, the testator left bequests for fifty two persons to be selected by his executors. Two of the executors, there were three, died

before the charity was administered. Lord Hardwicke decided that, as the power related to personal estate, it was a power coupled with an interest, and consequently went to the survivor. We do not see how the case is distinguishable from the case at bar ; for the power here relates to personal estate, and when executed will *pro tanto* control the disposition of it. Moreover our statute provides that, where there are several executors named in a will some of whom do not accept the trust, those who accept " shall have the same power and authority as is given by such will to the whole of them, *to every intent and purpose whatever.*" Pub. Stat. R. I. cap. 184, § 21. The language is very broad and peremptory, and we think it must control, at least unless the will itself clearly shows a different intent. The provision was in force when the will was made. Rev. Stat. R. I. cap. 156, § 18. And see *Weimer* v. *Fath*, 43 N. J. Law, 1, 9 ; *Brown* v. *Armistead*, 6 Rand. 594 ; *Taylor* v. *Morris*, 1 N. Y. 341.

The next question is in what manner shall the selection, made in pursuance of the power, be expressed ? We think this is a case in which the executrix, having come to the court for instruction, must exercise the power under the supervision of the court, the more especially as the fund, if it be turned over to the Pennsylvania Company, will as soon as it is turned over pass out of the jurisdiction of the court. In such circumstances we are clear that the fund ought not to be turned over until the purposes to which it is to be eventually applied are definitely determined, so that the company, when it receives the fund, may know with certainty the obligations which it assumes as trustee both under the will and under the purposes so determined, which being declared will become in legal effect a part of the will, binding the company as such. We will therefore let the cause go to a master for the executrix to submit to him a scheme for the distribution of the one third of the *residuum* which is subject to the power, to be settled before him, subject to the approval of the court. Boyle on Charities, 213–220 ; *Attorney General* v. *Glegg*, Amb. 584, note 3 ; *Paice* v. *The Archbishop of Canterbury*, 14 Ves. Jun. 364, 372.

The seventh, eighth, ninth, tenth, and eleventh questions are questions of identity. Section III. of the will gives " to the So-

ciety for the Aged and Infirm (women or men) in Newport $1,000." The bill shows that there is no society of that name but that there is a corporation incorporated as the " Association for the Aid of the Aged," established in Newport for the relief of poor, aged, and infirm persons, now by a recent change of name called " The Townsend Aid for the Aged." The rule is that a misnomer of the legatee or devisee is immaterial, if the person intended can be identified by the description in the will. 1 Jarman on Wills, 5th Amer. ed. 760, note; *Button, Executor,* v. *American Tract Society*, 23 Vt. 336; *Straw* v. *Societies*, 67 Me. 493; *Trustees* v. *Peaslee*, 15 N. H. 317; *Newell's Appeal*, 24 Pa. St. 197; *Maund's Adm'r* v. *McPhail*, 10 Leigh, 199. The legacy should go to " The Townsend Aid for the Aged." [1]

Section X. gives one third of the *residuum*, after the decease of the legatees under Section IX., to " The Managers or Directors of the Pennsylvania Hospital on Pine Street, in Philadelphia, and to the Managers or Directors of the Massachusetts General Hospital," &c. The bill shows that there are no such persons as the " Managers or Directors of the Pennsylvania Hospital on Pine Street, in Philadelphia," nor any corporation known by that name, but that there is a hospital on Pine Street, in the city of Philadelphia, in the State of Pennsylvania, which is controlled by " The Contributors to the Pennsylvania Hospital," which is the corporate name of a corporation established under the laws of said State of Pennsylvania, which said corporation claims that it is meant by the testator." We think " The Contributors to the Pennyslvania Hospital" are entitled to the legacy. *Winslow* v. *Cummings*, 3 Cush. 358. Section X. directs that one third of the *residuum*, last mentioned, " be paid to the President of Harvard University, in Cambridge, Mass., to the President of Yale College in Connecticut, to the Secretary of the Smithsonian Institute at Washington,

---

[1] The unreported case of the *Providence Children's Friend Society* v. *Howard*, decided by the Supreme Court in Providence County at the March Term, 1840, is in point. The testatrix there gave the residue of her personal estate " to the charitable female society established on the west side of the river in Providence, for the education of orphan children." The court decided that " The Providence Children's Friend Society," which was a charitable corporation, incorporated for the support and education of indigent children of both sexes, which prosecuted its work on the west side of the river, was entitled to the legacy.

D. C., and to Alexander Mercer Biddle, Alexander Mercer King, and Philip Mercer Rhinelander, should they or either of them then," *i. e.* at the death of the last surviving legatee under Section IX., " be alive, to be used by them for the establishment of scholarships or foundations in such colleges as they may select, for the benefit of such poor students as have passed through some of the public schools with the best reputation for character and ability." The bill shows, we think, that there are several misnomers in this bequest: to wit, that " Harvard University " is a misnomer for " The President and Fellows of Harvard College ; " " Yale College " a misnomer for " The President and Fellows of Yale College ; " and " The Smithsonian Institute at Washington, D. C.," a misnomer for " The Smithsonian Institution " of that city. We think, therefore, that one third of said *residuum* should, when the time comes for paying it, be paid to the president of the corporation in Cambridge, Massachusetts, denominated " The President and Fellows of Harvard College ; " to the president of the corporation in Connecticut, known as " The President and Fellows of Yale College ; " and to the secretary of the corporation at Washington, D. C., known as the " Smithsonian Institution," and to such of the three other persons named as are then alive, if either of them be then alive. For we are clearly of the opinion, and this answers the twelfth question, that the bequest is to the presidents and secretary of the corporations indicated, who hold office as such when the bequest shall be paid, and that the words, "Should they or either of them then be alive," apply only to the three persons designated by their names. Of course if these three persons should happen to die before the last surviving legatee under Section IX., the bequest will still remain to be paid to said presidents and secretary.

    *Samuel R. Honey*, for complainant and for the life beneficiaries.

    *Francis B. Peckham*, for the testator's next of kin and for the respondents Rhinelander and Townsend.

    *Christopher M. Lee*, for the Townsend Aid for the Aged.

    *Julien T. Davies*, for the Foreign and Domestic Missionary Society.

    *John E. Parsons*, for the Presbyterian Board of Home Missions.

    *John C. Gray & William Caleb Loring*, for the other respondents.